UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


– – – – – – – – – – – – – – – x

UNITED STATES OF AMERICA            3:19cr105(AWT)

       vs.

JOEL RILEY,
                         HARTFORD, CONNECTICUT
              Defendant     JANUARY 23, 2020

– – – – – – – – – – – – – – – x



**<u>SENTENCING</u>**

BEFORE:

     HON. ALVIN W. THOMPSON, Senior U.S.D.J.



APPEARANCES:


   FOR THE GOVERNMENT:

       OFFICE OF THE UNITED STATES ATTORNEY
       157 Church Street, 23rd Floor
       New Haven, Connecticut 06510
       BY:  NEERAJ PATEL, AUSA

   FOR THE DEFENDANT:

       OFFICE OF THE FEDERAL PUBLIC DEFENDER
       265 Church Street, Suite 702
       New Haven, Connecticut 06510
       BY:  TRACY HAYES, AFPD

                  Corinna F. Thompson, RPR
                  Official Court Reporter

1                        **11:00 AM**

2                THE COURT:  Good morning.  Please be seated

3       everyone.

4                We're here for sentencing proceedings in the

5       matter of United States of America versus Joel Riley.  The

6       docket number is 3:19CR105.

7                Would counsel please state their appearances for

8       the record and identify seated at counsel table with you.

9                MR. PATEL:  Thank you, Your Honor.  Neeraj Patel

10      on behalf of the United States.

11               THE COURT:  Thank you.

12               MR. HAYES:  Good morning, Your Honor.  Tracy

13      Hayes on behalf of Mr. Joel Riley, who's before Your Honor

14      this morning.

15               THE COURT:  Thank you.

16               The record should also reflect that United

17      States Probation Officer Chester is present.  She's the

18      author of the Presentence Report and she's seated in the

19      jury box.

20               Mr. Patel, I understand the victim notification

21      has been made in this case?

22               MR. PATEL:  Yes, Your Honor.  There are multiple

23      victims in this case.  We sent letters out, or e-mails out

24      to the victim financial institutions.  And also one of the

25      victims, who's the defendant's former wife, is present in

1    the courtroom today and wishes to address the Court.

2              THE COURT:  Thank you.

3              On April 17, 2019, the defendant, Mr. Riley,

4    entered a plea of guilty to a one-count Information

5    charging the defendant with bankruptcy fraud in violation

6    of Sections 157(a)(1) and (2) of Title 18 of the United

7    States Code.  The Court accepted the plea of guilty and

8    thereupon entered a finding guilty.

9              A Presentence Report was prepared for the Court

10   by the United States Probation Office.  I have reviewed

11   that report and the two addenda to the report in

12   consultation with its author, Probation Officer Chester.

13             I'll just confirm that counsel did have a chance

14   to read the second addendum and Mr. Riley had a chance to

15   read it.

16             MR. HAYES:  Yes, Your Honor.

17             THE COURT:  Okay.

18             Mr. Patel, is the government making a motion

19   pursuant to Guideline Section 3E1.1B for the third point

20   for acceptance of responsibility?

21             MR. PATEL:  Yes, Your Honor.  We do so at this

22   time.

23             THE COURT:  Thank you.  The motion is granted.

24             I think we put out a draft of what the

25   restitution order, so counsel have an opportunity to look

1    at that.

2              MR. HAYES:  We have.

3              THE COURT:  Nicole is also going to bring out a

4    draft of the schedule with the amounts and the victims.

5              Mr. Hayes, have you had an opportunity to read

6    the Presentence Report as amended?

7              MR. HAYES:  I have, Your Honor.

8              THE COURT:  As has your client read it or has it

9    been summarized for him by you?

10             MR. HAYES:  Both.

11             THE COURT:  And does the defendant have any

12   corrections or objections to the report as amend currently

13   amended?

14             MR. HAYES:  No, Your Honor.

15             THE COURT:  Thank you.

16             And Mr. Patel, have you had an opportunity to

17   read the Presentence Report as amended?

18             MR. PATEL:  Yes, Your Honor.

19             THE COURT:  And does the government have any

20   corrections or objections to the Presentence Report as

21   amended?

22             MR. PATEL:  No, Your Honor.

23             THE COURT:  In that case, there being no

24   objections to the factual statements contained in the

25   Presentence Report as amended, the Court adopts those

1    statements as its findings of fact.

2          The defendant in this case faces a possible

3    maximum sentence of imprisonment for five years.  He faces

4    a supervised release term of as much as three years, and

5    if he violates his conditions of supervised release the

6    Court then could sentence him to additional time in prison

7    of as much as two years.

8          In addition, Mr. Riley faces a possible fine of

9    as much as $250,000.

10          Under Title 18 United States Code Section 3556,

11    the Court must order restitution in accordance with

12    Sections 3663A and 3664.

13          And finally, under Title 18 United States Code

14    Section 3013, I must impose a mandatory special assessment

15    of $100.

16          Mr. Patel, is the Court's statement of the

17    maximum sentence in this case accurate?

18          MR. PATEL:  Yes, Your Honor.

19          THE COURT:  Mr. Hayes, is that your

20    understanding as well?

21          MR. HAYES:  Yes, it is, Your Honor.

22          THE COURT:  Thank you both.

23          Pursuant to Title 18 United States Code

24    Section 3553, one of the factors the Court must consider

25    in determining the particular sentence to be imposed in

1   this case is the Sentencing Guidelines.  Consideration of

2   the Sentencing Guidelines requires determination for this

3   case of the applicable Guidelines range, which is based on

4   the applicable total offense level and the defendant's

5   criminal history category.  The Presentence Report

6   calculates the total offense level to be 17 and the

7   defendant's criminal history category to be Category I.

8   Consequently, the advisory range under the Sentencing

9   Guidelines is as follows:

10          A term of imprisonment in the range of 24 months

11   to 30 months, a one- to three-year term of supervised

12   release, a fine in the range of $10,000 to $95,000,

13   restitution in the amount of $211,142 and a $100 mandatory

14   special assessment.

15          Ms. Chester, is the Court's statement of the

16   Sentencing Guidelines calculations accurate?

17          PROBATION:  Yes, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Hayes, before we proceed further, I would

20   like to give you an opportunity to make any statements you

21   wish to make on behalf of your client.  And Mr. Riley, if

22   there's anything you'd like to say, sir, I would certainly

23   be very interested in hearing that as well.

24          MR. HAYES:  Thank you, Your Honor.

25          Your Honor, I want to start off by informing the

1   Court of something that we have not yet conveyed to the

2   Court.

3           At some point, it was at least not this summer

4   but a summer ago, as we were moving towards an agreement,

5   I contacted the government with the possibility of coming

6   in for a proffer.  So we did that.  Attorney Patel did not

7   have to allow us to come in.  We knew that we were moving

8   towards an agreement, but he did give us that opportunity.

9           We met because, frankly, we were hoping that we

10  could either plead to a misdemeanor or even some type of

11  deferred prosecution, if that were possible.  So I want to

12  at least inform the Court of that meeting.

13          We met with the government for at least an hour

14  and a half, if not a little bit more.  The risk was, what

15  I've learned from -- well, what I've always known, but I

16  thought it was just me -- that as the defense attorney I

17  was always the last person to know.  I knew the least from

18  the government, what they knew, what the agents knew, and

19  really, what my clients knew.  Until I was watching the

20  news and realized that some of the campaign officials

21  would lie in proffer sessions and someone mentioned the

22  defense attorney is always the last to know.  So it was a

23  huge risk on our part, but we thought it was beneficial

24  because we wanted to be truthful.  We wanted to be as open

25  as possible.

1          My impression was we were just really going to

2    talk about the facts of this case, the offense conduct in

3    this case.  But while we were there -- again, with where

4    I'm always the last to know -- there were so many

5    questions about previous conduct, past conduct that had

6    come up that I didn't know the answers to.  I didn't even

7    know that it existed because it really didn't impact on

8    our plea negotiations on where we were headed, at least so

9    I thought.

10         I could say to the Court that Mr. Riley was

11   candid.  He was truthful.  He gave full information.

12   Sure, at times was he hesitant because we didn't expect

13   that.  I did not prepare him for any of that.

14         So unlike when we find -- I don't know -- a

15   fraud case where bank fraud, where you see that offense

16   conduct in your present case, you may ask, hey, has this

17   occurred before?  And then you find out about maybe some

18   other times and you could advise your client.  Or even a

19   drug case; same, similar way.  But here I didn't know.

20   But I will say Mr. Riley conducted himself and was again

21   very candid, very truthful.  Did it lead to any

22   information in terms of other arrests or other

23   convictions?  No, no.

24         But I want to talk about that because that's not

25   in front of the Court, but I wanted to convey that to the

1    Court.  We did make those efforts.  This is what we ended
2    up with in terms of our stipulated plea and where we are
3    today.
4            But I want to ask the Court to consider that in
5    terms of the guideline range and in terms of sentence.  So
6    I start there.
7            Your Honor, Mr. Riley is 58 years old.  So he's
8    a father.  As the Court -- did I say 58?  I'm sorry.
9    Forty-eight years old.  I'm glad he corrected me,
10   Mr. Riley did.  I don't know why I aged him like that.
11   I'm sorry.
12           I'm sorry, Joel.
13           Joel is 48 years old.  He has a family.  A
14   family man.  He has children, varying ages.  This is the
15   first time that he's been before the Court sitting at
16   defense table where he's facing sentencing.  As the Court
17   knows his history, he's worked in the court system but
18   he's never about been on this end.
19           I talk about that because for all of these years
20   he's avoided getting himself into legal trouble, at least
21   criminal trouble.  That's important because he lived a
22   whole life of someone who was a law-abiding citizen trying
23   to follow the rules.  And of course the government is
24   going to say, hey, but look at that history that you just
25   talked about.  Right.  The Court knows about that.

1          I think what's different from bankruptcy fraud

2    and the fraud in this case and what we normally see, Your

3    Honor, is let's consider it this way:  Mr. Riley is a

4    human resources director.  So he has access to all types

5    of information.  He's always had that access, whether it

6    was his years of working for the court system or even now.

7    Always.  He's never used any of that information to commit

8    fraud.

9          So what we see is, what did he do?  Well, he

10   hurt those closest to him, people that he loved.  But he

11   was trying to help in a lot of ways.  I'm going to leave

12   some of that for Mr. Riley.  I can definitely answer

13   questions, but he's not committing fraud with strangers,

14   with just randomly.  That's not what he's doing.  So the

15   instances of fraud are, again, with someone who's very

16   close to him.

17         I think it's important to note, Your Honor, in

18   no way was Joel living a lavish life-style.  When we

19   have -- we see the extent of the fraud here.  I think the

20   order is for $211 (sic) in terms of the restitution, the

21   potential order.  Yes, that's a significant amount of

22   money, but most importantly, we don't see any drugs here,

23   any drug use, any addiction, we don't see any gambling, we

24   don't see any jewelry, there's no boats, there's no

25   cruises, there's no vacations.  We see someone who's

1     trying to take care of his family.  That's does not make

2     his actions, his conduct, his misconduct right.  That's

3     just the facts here.  So it's not someone who's stashing

4     away money.  It's someone who's barely making ends meet

5     and trying do that and at best take care of his family.

6                 Was there a better way?  Sure.  Was there a

7     different way?  Sure.  Would he have to sort of tighten

8     his belt and do like most of us and sort of scale down?

9     Yes.  But didn't want to disappoint.

10                I talk about that, Your Honor, because the Court

11    is also aware of Mr. Riley's history, his childhood.  So

12    we're talking about someone from around the age of eight

13    or nine up until his early 20s dealt with his mother's

14    illness.  So it's this any day now, this week, today,

15    something could happen.

16                We talk about how he spent, in my sentencing

17    submissions, how he spent his early Christmas holidays in

18    the hospital, nine years old, ten years old, celebrating

19    Christmas with his mother, and then having to live that

20    and grow up in sort of this environment where his mother

21    is keeping a strong face and he is as well.  He's not

22    trying to disappoint his parents.  So there was no

23    smoking, no drinking, nothing of that nature as a child.

24    He wanted to make his parents proud.  He wanted his

25    parents' approval.

1           I say that, Your Honor, because what we see,

2    what we're starting to learn is what happens to us in our

3    childhood affects us when we are adults.  It just -- I

4    think all of us.  None of us can escape that.  Whatever

5    the environment is, if it's a nurturing environment, then

6    oftentimes that plays out, sure.  Other times when it's

7    not a nurturing environment and someone is able to fight

8    through and excel?  Sure, absolutely.  But we still find

9    what happens in our childhood in terms of traumatic

10   instances -- and here he lived that -- it affects us for

11   the rest of our lives.

12           So I say that because the Court has had the

13   opportunity to review the I guess what would be the

14   summary from Dr. Heibel.  That's important because he

15   talks about it.  The doctor talks about Joel's childhood

16   and what he sees as the connection with where we are

17   today.

18           I do want to address, because I think it's

19   important in terms of the summary.  So this is not -- I

20   didn't reach out to Dr. Heibel to give us a forensic

21   evaluation.  So this is not something where the Court

22   would typically see where we asked the doctor, where we

23   hired him or retained that person as an expert.  That's

24   not what we did here.  This doctor had been treating Joel

25   since at least 2008, 2009.  He helped Joel and his family

1    through Joel's divorce with Ms. Kelley, his first spouse,

2    his first wife.  So it was the Doctor not only meeting

3    with Joel, but actually mediating their divorce

4    proceeding.  So that was the initial meeting.

5           So when in the government's submission where the

6    government indicates that, well, the doctor didn't know,

7    he had no idea about the history, he doesn't talk about

8    that because all he's addressing is this case, the offense

9    conduct in this case.  So not any relevant conduct.

10          Of course he knows the history.  He's met with

11   Joel at that point or at least moving up to now for almost

12   11 years.  So they've had that interaction.  To say that

13   everything that Joel has reported is self-reported, well,

14   that's the nature of therapy.  It's self-reporting.

15          So I'd ask the Court to consider that.  We did

16   not retain him.  What he did was offer some type of

17   summary because I thought that would be important for the

18   Court to at least have a sense of what was going on with

19   Joel in his life for the past ten years or so, if not

20   more.

21          So again, Your Honor, did he have access to

22   court documents?  I did not provide access, but that's not

23   what we were looking for.  Does he know why Joel is here

24   today?  Absolutely.  He's very well aware of that.  Does

25   he know of any of the early instance?  Yes, sure.  He had

1    to.  He acted as a mediator for the divorce so of course

2    he knew.

3             So there's no -- we weren't trying to hide

4    anything there.  We were just trying to again inform the

5    court.

6             THE COURT:  I read a sentence in his report

7    differently than it was written in the second paragraph,

8    the second -- I'm sorry -- the second page, the second

9    paragraph.  The sentence begins, "He became a caretaker

10   child."  I read that as putting her needs a head of his,

11   correct?

12            MR. HAYES:  Yes.

13            THE COURT:  That's not what it says, but that's

14   the way I read it.

15            MR. HAYES:  That's how it should be read.

16   Absolutely that's how it should be read.

17            THE COURT:  Okay.

18            MR. HAYES:  That I know just from talking to

19   Joel's -- from Joel.  I had conversations with his father

20   and just seeing what was mentioned by his first wife.  She

21   went through that death with Joel at the time.  In fact, I

22   think she talks about how that changed Joel.

23            I think what we see -- in looking at the report,

24   looking at the summary, he talks about sort of the smiling

25   depression.  If you talk to Joel he's not going to present

1    in a way where you see he's depressed.  But people often

2    do that.  We see people who take their lives and the

3    question is, I didn't know.  Who would have known?  The

4    person closest to them, did they know?  Did their friends

5    know?  So that smiling depression where he's sort of

6    living through these traumatic experiences and acting out.

7            The doctor concluded that it's not unusual for

8    that traumatic experience or his childhood experience to

9    sort of manifest itself in what we see today.

10           Your Honor, ultimately I'm asking the Court to

11   consider, frankly, a non-incarcerative sentence.  Why?

12   Because it would allow Joel to continue to work.  I knew

13   that Joel was unemployed for almost a year it seemed.  So

14   he started to find work but he was laid off or terminated

15   from that position.  He worked with an agency.  But then I

16   would talk to Joel when he was looking for work and I know

17   that he diligently did that.  So we talked about it.  He

18   was hoping to find work.  I'd say we'd talk in a couple of

19   days and that didn't happen at this agency or this

20   company.

21           Joel finally finds a job in Brooklyn, New York

22   of all places.  Your Honor, I travel to Brooklyn, I don't

23   know, a couple times a month.  He's several miles,

24   frankly, from where I grew up.  I don't like to travel on

25   the weekends just to make that trip.  He does that every

1    day.  Oftentimes we try to have quality time when we're

2    talking about moving forward and preparing on the phone as

3    he's driving back from work in the evening.  It's a long

4    drive.

5              But that's where he's working currently.  It

6    took him quite some time to find that position.  He's

7    gainfully employed.  He's been there for several months

8    now.  He loves working there.  They love having him work

9    there.  I think that's important because he's productive.

10   Incarcerating Joel at this point in his life where he's

11   trying to, again, maintain his household -- he lives by

12   himself -- and continue to take care of his family,

13   continue to meet his court obligations, would definitely

14   be more than a step back.

15             I know the Court is well aware of the effect of

16   prison sentences on families.  I know that in the

17   government's submissions it talked about, well, that's

18   calculated, how the families are affected.  Those cases

19   are from the '90s.  I point that out because things have

20   changed.  The Court can now consider those 3553(a)

21   factors.  And yes, is a family and a defendant's

22   obligation with their family, should that be factored into

23   the sentence?  Sure, sure.  Could it be considered?

24   Absolutely.

25             It's not just that incarcerating Joel means that

1    he loses his job, his form of employment, his ability to

2    take care of his family, but it's what it does to his

3    family.

4         Your Honor, I tell my clients often that even if

5    it's six months, seven months, eight months, for those of

6    us who do this every day, it's not a lot of time.  It's

7    just not.  But for defendants, it changes your life.  He

8    now has to, after he serves that time, come back out and

9    find work.  It took him a year to find work.  He drives

10   over two hours each day each way to get to his job.  I get

11   it.  A lot of people do that.  But it's pretty far.  When

12   I say two hours, I know the drive back is closer to three

13   hours oftentimes.

14        I'd ask the Court to consider that, yeah, the

15   statute maximum here is five years.  There's a reason for

16   that.  Not that we don't take this seriously.  I'm not

17   asking the Court not to take it seriously.  I know the

18   Court would not.  What I'm asking the Court to consider is

19   that he's at a 24 to 30 months.  We have someone who's

20   never been before a judge before in this capacity.

21   Twenty-four to 30 months for someone with no criminal

22   history is significant.

23        If the Court does not have any further questions

24   I would ask for Mr. Riley to address the Court.

25        THE COURT:  Certainly.  Thank you.

1          MR. HAYES:  Thank you, Your Honor.

2          THE DEFENDANT:  Your Honor, I went ahead and

3    wrote these out because I didn't know if I would be able

4    to, frankly, keep it together and remember them for you.

5    So please bear with me as I go through the paper.

6          THE COURT:  Certainly.

7          THE DEFENDANT:  Your Honor, as a beginning and

8    really the starting place, I'm beyond remorseful and

9    sorry.  I'm sorry to many; to Brittany; my father; my

10   children, Evan, Gracie, Henry and Gabe, who, as the Court

11   is well aware, is no longer here; Attorney D'Agostino and

12   all others here today.

13          I took something from those I love to help the

14   very people that I love the most.  I never took these

15   actions for personal gain or material objects.  I don't

16   gamble, I don't use drugs.  I never have.  I didn't buy a

17   new car or any other lavish items.  Through my flawed,

18   defective and wrongful thinking I was keeping my family

19   afloat on one income, putting one son through college and

20   trying to maintain and keep things above water.  This is

21   not an excuse at all, but just the real explanation.

22          Once the years of trying to juggle this and

23   repay became overwhelming, coupled with the tragic loss of

24   my son Gabe, I took the final devastating step in this

25   case that I am forever sorry for.  I was wrong.  I don't

1    make an excuse.  I take account for what has happened.

2          Since my arrest I've been working very hard to

3    be the person who most people do know.  I supported my

4    older son emotionally through the horrific, tragic Gabe

5    suicide.  I found and excelled in my employment in a job

6    that I truly love and enjoy that allows me to provide for

7    and support my financial obligations and my family.

8          I have remained a strong force and active in all

9    three of my children's lives.  I've connected with an

10   organization that assists youth who are in similar

11   situations that Gabe found himself in.  I've established

12   and maintained an excellent home for my kids.  I'm looking

13   forward to my daughter Gracie's kindergarten -- sorry --

14   graduation in June, Evan's college graduation in May.

15   We've been asked in June to walk through and receive an

16   honorary high school diploma in Gabe's name for what would

17   have been his high school graduation.

18          I ask that you take all of this into

19   consideration and please know that I have felt the weight

20   of what I have caused and am willing to do whatever it

21   takes to repair that damage.  I don't believe sending me

22   away assists in that.  It will further punish those who

23   have I've already hurt even further.  Evan will lose my

24   financial support, his continued emotional grounding with

25   Gabe, and I will miss his college graduation.  Brittany,

1  Gracie and Henry will lose the sole financial support and

2  my kids will obviously miss my interaction and parenting

3  on a daily basis.  If I go away I will lose my home, my

4  job and my family will lose its emotional and financial

5  sole support.  Reestablishing those to this level will be

6  nearly impossible.

7          I want you to know, Your Honor, in this case --

8  sorry.  I want you to know, Your Honor, this case, this

9  process and the events that have -- and these events have

10 had the most significant deterrent effect one could ever

11 have.  I've lost my wife, I've lost full interaction and

12 parenting with my kids, I've lost relationships,

13 friendships and more.

14          You might ask, how can you be certain this won't

15 happen again.  Well, I can assure you after this

16 experience it will not, whether I serve one day or 30

17 months, the same effect has been had.

18          Finally, what I now have that I never had in my

19 life is a truthful light on me that I've never enjoyed.  I

20 spent years not talking or sharing or being open with

21 struggles.  That has ended.  So not only can I assure you

22 that I will not take these actions again, but I can

23 definitely assure you those involved, not only in this

24 case, but in my life who were well aware of what's

25 happened who love and support me will keep me to account.

1          I created this mess and I'm on my way down the

2    long road of cleaning it up and repairing what I have some

3    control of.  Please allow me to continue this and find an

4    alternative to prison.

5          Thank you for listening, Your Honor.

6          THE COURT:  Thank you, sir.

7          Mr. Patel.

8          MR. PATEL:  If I can have one moment to confer?

9          THE COURT:  Certainly.

10              (Pause.)

11          MR. PATEL:  Your Honor, at this time I think it

12    would be appropriate for the victim, Mr. Riley's former

13    wife, to address the Court, if that's fine.

14          THE COURT:  Certainly.

15          Do you want us to not use her name?

16          We'll have you identify yourself for the court

17    reporter.

18          MS. CORREA:  Brittany Correa.

19          I am not as prepared as both Joel himself and

20    his attorney.  I did address the Court a few months ago in

21    a letter that I sent.  I hope Your Honor has had the

22    opportunity to read it.

23          In my head I knew what I was going to say today

24    and then I walked through those big intimidating doors

25    downstairs and I left it all there.

1          I think Joel addressed a lot of what I wanted to
2     speak.  I'm not going to dismiss what happened and what he
3     did.  It has had a huge impact on myself and my children,
4     but I'd like to say, almost two years later, I'm doing a
5     really great job of getting my life back in order
6     financially.
7          But no matter what, Joel and I co-parent as a
8     team.  We've always co-parented as a team.  And he is a
9     present father in their life.  My children miss their
10    father when they're in my home, and they miss me when
11    they're in his home.  And I know that having two stable
12    parents is the best that we can give them.
13         I know in my letter I addressed that Joel and I
14    both made the conscious decision after the birth of our
15    daughter in 2014 for me to remain home and be the
16    caretaker of her and now our son.  By no means am I
17    incapable of having a job.  I had a job.  But right now we
18    are saving on child care costs, we are saving on before
19    and after school costs, all those things that I would have
20    to solely incur if Joel was in fact incarcerated.
21         We are losing our home to foreclosure.
22         Thank you.
23         Those proceedings have begun.  I protect my
24    children from that because that's not a burden they need
25    to carry.  There's been so much loss in our lives:  The

1    loss of a son, the loss of a marriage, losing a home.  I

2    just don't want my children to have to lose any more.  I

3    know I'm only one person to consider when it comes to what

4    was done.  I'm also the only victim here today that's

5    stating what I'm seeking.

6         I want Joel to continue to be a present father.

7    I want Joel to continue to abide by his court obligations.

8    And I do see incarceration as him losing his job, losing

9    his home, losing his children for an extended period of

10   time and the ramifications that would have on everyone

11   would just be detrimental.

12        I can go on and on and not sound like a broken

13   record and I'm not going to do that to the Court today,

14   but I can stand here and I would ask the Court if there is

15   any alternatives to incarceration, to consider it for

16   Joel, myself, our family and not have to endure another

17   loss.

18        Thank you.

19        THE COURT:  Thank you, ma'am.

20        MR. HAYES:  Your Honor, can I just say this last

21   thing before Attorney Patel addresses the Court?

22        THE COURT:  Certainly.

23        MR. HAYES:  I think it's important to talk about

24   those collateral consequences.  I know that the Court is

25   mindful of them, but just -- I see it happening in

1    realtime with former clients who will contact me after

2    having been out of jail for two years with a Master's

3    degree and still finding it difficult finding work.  So

4    it's real.  It does happen.  Even with someone with the

5    type of experience that Joel has, it happens.

6         So again, it's not just serving a sentence so

7    that it could provide general deterrence.  We understand

8    that.  Or specific deterrence.  We understand that.  But

9    again, it's everything that happens.  So when we see these

10   articles -- so I'm thinking about deterrence -- when we

11   see a news article, you'll sometimes see the replies from

12   some of the readers, yes, that person should have gotten

13   the maximum or more time or how could you do that?  And

14   they're not aware of everything that happens in the case,

15   but more importantly, what happens afterwards.  So most of

16   us don't have to see that, but we know that happens and I

17   would ask the Court to consider that here.

18         Thank you, Your Honor.

19         THE COURT:  Thank you.

20         Mr. Patel.

21         MR. PATEL:  Thank you, Your Honor.

22         Your Honor, this is an unusual situation.  In my

23   experience the victim is often looking for incarceration,

24   sometimes more often asking for more than the government's

25   recommending.  Here, one of the victims, a family member,

is asking the Court to impose no jail time.  The
government understands and is sympathetic to Ms. Correa's
position, which appears to be primarily due to her
reliance on Mr. Riley for financial support and the
emotional impact incarceration will have on the children.
But the government would submit that this is an issue for
many defendants who appear before the Court facing
sentencing.  Many defendants have families who rely on
them.  Many defendants have children.  And while his
obligations and the impact on the children are certainly
something for the Court to consider, the government does
not believe this means no jail time.  Otherwise, many
defendants would simply come to court and say, you can't
put me in jail because of the impact this is going to have
on my family.

In addition, Your Honor, Ms. Correa is not the
only victim here.  First, there's the United States
Bankruptcy Court in this district, and we address that in
our sentencing memo and I won't repeat those arguments
again.  And there's also the financial institutions that
were defrauded out of just over $200,000.

Mr. Riley didn't simply click on a few links
online and fill out some applications and obtain some
loans.  He engaged in an elaborate scheme to defraud the
banks.  He supplied these banks with false information

1    that was material to the banks, false information about

2    Ms. Correa's income and her employment.  He created a fake

3    e-mail account in her name, falsified pay stubs and bank

4    statements to support the false income that he said she

5    had.  He had the monthly loan statements sent to a post

6    office box so Ms. Correa wouldn't know about the loans.

7           Then, when he could not pay back the debts, he

8    took elaborate efforts to conceal the fraud.  He attempted

9    to discharge the debt through a false bankruptcy petition.

10   And as part of that effort he forged a power of attorney

11   in her name and he recruited another woman to impersonate

12   his wife in order to file the false petition.  He acted in

13   complete and utter disregard to the consequences to

14   Ms. Correa and to the financial institutions.

15          Now, a few moments ago counsel for Mr. Riley, I

16   would argue, somewhat attempted to minimize the conduct by

17   saying, well, he has access to information about all these

18   other people and he didn't commit fraud in their names,

19   only family members.  It's still fraud, Your Honor.  And

20   it's perhaps even worse because he betrayed those family

21   members, the love and trust that they placed in him.

22          In addition to the elaborate nature of the

23   scheme and the impact on the victims, the government

24   submits that some term of imprisonment is warranted here

25   for purposes of specific and general deterrence.  I would

note that when he took out these loans, or obtained these

loans, in 2015 and 2016, he was employed by the state of

Connecticut Judicial Branch as a human resources manager.

His 2014 tax returns show wages of $136,000.  His pay

stubs in 2016 from the Connecticut Judicial Branch show

biweekly wages of $4,687, which is roughly $122,000 a

year, plus he received health benefits and dental

benefits.  That's a lot more money than the average person

makes, and the government would submit he was not

struggling financially.  And if he was, the answer was not

to go behind his wife's back and engage in fraud and then

purchase a new home that they constructed, having the

value of $500,000, $600,000 that he couldn't afford.  Now,

he says that's not a lavish life-style, but the government

submits that the value of that home is above the median

value of what the average person has in Wallingford where

they live.

What's more troubling is that these seven loans

that he obtained was not isolated behavior.  Years ago he

took out loans in his first wife's name and in his

father's name.  One would think when that was discovered

and came to light -- especially during the divorce with

his first wife and he was required to pay off those debts

that he took out in his first wife's name -- one would

think that would deter him from engaging in such conduct

1    again.  One would think that in 2015 and 2016, when he

2    took out these loans in his second wife's name, he would

3    have said to himself, you know, I engaged in this conduct

4    before and it backfired on me.  I better not do it again.

5    But no, it didn't deter him and he went ahead and took out

6    the loans, this time in his second wife's name.

7            As I indicated earlier, this was not just a

8    matter of a few clicks online to apply for these loans.

9    All throughout 2015 and 2016 he was applying for loans in

10   the names of his second wife, his father, and even his

11   first wife, who he was now divorced from, and the

12   applications just kept getting rejected for suspected

13   fraud.  Those instances are in the PSR.

14           Again, you would think that these rejections

15   would be a sign to him, maybe I shouldn't do this.  But

16   no, he was persistent and he kept on applying and applying

17   and applying numerous times, and on seven occasions he was

18   successful, which brings us here today.

19           I want to address briefly the psychological

20   summary that counsel referred to a few moments ago.  We

21   address that in our supplemental memo.  One thing that

22   struck me is Attorney Hayes said, well, the psychologist,

23   of course he knows about Mr. Riley's history and he knows

24   about the prior instances.  How do we know that?  It's not

25   mentioned in the summary.  He's essentially just asking us

1      to take the defendant's word that it was discussed.  Your

2      Honor, I don't take the defendant's word, given his

3      history here.  I just don't take his word.  If he

4      considered it, it needed to be in the report and it's not.

5              Moreover, Your Honor, it doesn't seem like he

6      may be aware of the present offense conduct -- again,

7      we're taking his word for it -- the last time he actually

8      had a session with Mr. Riley was in 2017.  He certainly

9      didn't have an in-depth session with Mr. Riley where he

10     discussed this case and discussed the effects it's having

11     on him and explored with him the reasons behind the fraud

12     with him.  The government would think that would be

13     necessary in order for him to make a conclusion and it's

14     not there.

15             For all those reasons, Your Honor, as well as

16     the reasons in our sentencing memo, we would ask for a

17     sentence of imprisonment.  In our memo we ask for a

18     guideline sentence.

19             Just to clarify our position -- and Attorney

20     Hayes mentioned this earlier -- I would note that

21     immediately upon his arrest, Mr. Riley did fully admit his

22     offense conduct in a post-arrest interview with the FBI

23     agents.  And then Attorney Hayes is correct, he and

24     Mr. Hayes did come and meet with the government and the

25     case agent in a proffer session where he admitted his

1    conduct again and provided us with details of the offense.

2              I would note that we were already aware of all

3    the information that he provided during that session.  It

4    was not really anything new.  But he did admit his conduct

5    and accept responsibility, and because of that it did save

6    the government resources and time.

7              So while we are recommending a guideline

8    sentence, we would recommend a sentence at the low end of

9    the Guidelines range.  Regardless of the Guidelines, we do

10   believe some term of imprisonment is necessary.  And we

11   would also ask for the maximum term of supervised release

12   with all the conditions noted in the Presentence Report,

13   which the defendant agreed to in the plea agreement.  One

14   of those is a condition which Ms. Correa asked us to

15   include, if possible.  It's in the plea agreement.  That

16   he, Mr. Riley, be precluded from using the identities of

17   her or her children without their permission during that

18   period of supervised release.  That's reflected in the

19   PSR.

20             We would also ask for the financial conditions

21   that are recommended.  It is clear to the government that

22   Mr. Riley has an inability to properly manage his

23   financial affairs and that his finances need to be

24   diligently monitored and reviewed.  He still owes a lot of

25   people money, including -- it's in our memo -- that poor

1    teacher with three kids who he dated after separating from

2    his wife.  He borrowed money from her and hasn't paid a

3    dime.  These conditions are reasonable, and in light of

4    his history and characteristics and important to ensuring

5    he doesn't get himself deeper into debt that he can't pay

6    back.  So we would ask the Court to impose the maximum

7    term of supervised release with all the conditions

8    recommended in the Presentence Report.

9               THE COURT:  Thank you.

10              MR. HAYES:  Your Honor, may I just reply?  I

11   think I need to correct the record, if I may.

12              THE COURT:  Sure.

13              MR. HAYES:  The government counsel talks about

14   many families face their -- the breadwinner, the head of

15   the family being incarcerated, being imprisoned.  Yes,

16   absolutely.  We see that quite often where a defendant,

17   male or female, will have children who rely on them, who

18   they take care of, who they work to provide for are

19   incarcerated, yes.  That's a fact here.  But what's

20   different are the specifics of this case.  Everyone who --

21   frankly, you heard from the victim, the main victim here,

22   Ms. Correa.  She's supportive.  People love him.  People

23   still support him.  She's not just here because she wants

24   to make sure to ensure that he continues to pay for his

25   child obligations, his child support, or to provide for

the family.  That's not the only reason she's here.  I
think the Court could discern that from her representation
today.  She still cares for Joel.  She does not want to
see him incarcerated.  It's not just for financial
reasons.

Which takes me back to the specifics of this
case.  We don't try to minimize at all his actions with
the bankruptcy court, much less with what happened with
filing for loans.  We don't.  We can't.

Which takes me back to the proffer.  We gave no
new information because the government said they knew all
of this.  I didn't know.  So it was such a risk that he
could have lied anywhere along that route and been
charged.  He didn't.  He was candid.  He was truthful.  He
was complete.  He was thorough.  That says something.

Not only that, but you heard from the government
from day one when he was arrested he was candid with the
agents, the arresting officers.  This case has been
hanging over Joel's head for two years.  That's definitely
a sentence, knowing every day that, you know what?  I have
to continue to look for work.  I have to continue to
provide for my family.  Losing credibility.  His name is
in the public sphere, not as someone who's contributing
but someone who's now facing a sentence, a federal
criminal sentence and who has to lose everything that he

1    has.  That's important.

2           Again, taking me back to the proffer and why we

3    spent an hour and a half, close to two hours giving

4    information at risk.  Usually I know some of these

5    answers.  I knew nothing.  Again, I think that's important

6    in no way did we try to minimize, Your Honor.

7           When the government says, well, he was making

8    $136,000 in 2016, I believe.  That's a lot of money.  Is

9    it really?  Yes, for some people who appear before this

10   Court and are barely making $20,000, yes.  But $136,000

11   when you're maintaining not only your house, trying to pay

12   a mortgage and your household and your children, but also

13   you have support obligations from your previous marriage,

14   and not to mention, your wife is home taking care of the

15   family.  That was a loss of income of at least $80,000

16   from her employment when she stopped working.  That says

17   something.

18          Your Honor, in no way do we see anything in the

19   Presentence Report about a Mercedes or BMW or trips or

20   jewelry or gambling.  Nothing like that.  He's barely

21   driving I think it was a Hyundai Santa Fe that he couldn't

22   afford and it was repossessed the some point.  He's trying

23   to take care of his children.  He's putting his child

24   through college.  That means something.

25          Yes, $136,000 in a vacuum, that's a lot of

1    money, but when we consider all of his obligations that

2    most of us have, that says something.  And I believe that

3    mitigates some of what we see.

4          Could it have been easy?  Hey, look, you have to

5    go back to work.  You can't take care of the kids.  We

6    need that income.  And no, we can't move here.  Your

7    Honor, look at his history.  He wanted to, when he was a

8    child, take care of his mother, and that's what we see

9    through out his childhood.  He couldn't say no.

10         So I definitely wanted to correct the record

11   with that when we talk about history repeating itself.

12         Again, you even see from his first wife, from

13   her letter, she supports him.  Yes, does she still feel

14   the sting of betrayal in the marriage?  Absolutely.  Do

15   you see that?  Sure.  But what you also see is someone

16   who's supportive, who doesn't want to see the father of

17   her children go to prison, not only just because he's the

18   father of the children and he still has some obligations

19   to pay, putting the son through college, but because she's

20   supportive of him because of the closeness of that

21   relationship.  People understand, no, this doesn't happen

22   every day.  You don't defraud your spouse or people close

23   to you.  It does not, Your Honor.  But what you see is

24   they support him, supported him then and continue to do so

25   now.

1    We talk about this, I don't know, poor teacher.

2    Really, I don't believe the government knows the full

3    facts of that.  I don't think we have to address that

4    here, but, Your Honor, she supported Mr. Riley.  In fact,

5    he finds out about the investigation from her, that

6    they've talked to her from her.  While they're friendly

7    out on some type of date spending time, she told him about

8    it.  I guess the government must have gone back at some

9    point and continued to do whatever they did with their

10   investigation.  Hey, you're defrauded too.  No, no, none

11   of that, Your Honor.  I would ask the Court to give that

12   very little weight.

13   And even if it does, again, it's not Mr. Riley

14   defrauding just random people, taking Social Security

15   numbers, dates of birth, names.  That's not what he's

16   doing.  It doesn't make it right.  What he's doing is

17   trying to take care of his family.  Again, he's hurting

18   those people that he loves and he's also trying to help

19   them.  That wasn't the way to go about it.  We know that.

20   Your Honor, frankly, when we talk about the

21   psychological summary, let's bring him in here.  We can

22   ask him what he knew.  Your Honor, respectfully, he was a

23   part of the family's life during the first divorce.  Not

24   only did he meet with Joel, he met with Ms. Kelley, his

25   first spouse, and their two children, both collectively

1    and individually, in an effort to mediate.  So of course

2    that information came out.  We could bring him in here to

3    find out whether or not he knew.  Your Honor, I would ask

4    the Court to consider that.  We're not misrepresenting

5    that in any way.

6            Just to make mention of this, I think the

7    government says, well, the last session was in 2017.

8    Well, he was arrested in around I'd say 20 --

9            THE COURT:  May 2018.

10           MR. HAYES:  That's correct, Your Honor.  He had

11   contact -- "he" meaning Mr. Riley -- with Dr. Heibel,

12   whether it was text or whether it was by phone, up through

13   the timeline of this case.  So that would be -- it says

14   that the date of offense concluded in June of 2017.  So

15   there was definitely contact in December of 2017,

16   November/December of 2017.  Did he discuss some of the

17   troubles that he was having?  I'd leave that for another

18   day unless the Court wants an answer.  But I can inform

19   the Court that he's typically very open with his

20   therapist, now his former therapist, and I think that's

21   important, and he has been over time.

22           So this is not everything.  This is not a

23   comprehensive report.  Again, I didn't retain this

24   gentleman.  This is just a summary of their history.

25           And I should say this, Judge.  I'm sorry.  I did

1    have contact with Dr. Heibel and asked him, hey, this is

2    when we need the report for court.  It was around the time

3    I asked the Court for an adjournment.  I could inform the

4    Court that what happened after that was Mr. Riley met with

5    the doctor for at least two hours.  So they talked about

6    everything leading up to where we are.  It wouldn't be

7    advantageous for him to lie to his doctor.  How could the

8    doctor help him?  He told him everything.

9              Again, this is not the normal psychiatric

10   evaluation that we would provide the Court.  This is just

11   a summary of his history with therapy.

12             Thank you, Your Honor.

13             THE COURT:  Thank you.

14             MR. PATEL:  Your Honor, I'll just be brief.

15             I want to address this point about the woman he

16   dated that he borrowed money from and Attorney Hayes'

17   representation that he learned -- Mr. Riley learned from

18   her about the government's investigation.  That is

19   absolutely 100 percent false because that woman called us

20   after she saw the press release of his arrest and said,

21   hey, I know this guy.  Let me tell you about my situation

22   with him.  We had never spoken with her before.  So there

23   is no possible way he could have learned about the

24   investigation from her.

25             That was not the only woman that he borrowed

1    money from.  He dated another woman that he borrowed money

2    from.

3             So to say there's a pattern here, he didn't want

4    to say, hey, I need to provide for you and give you money.

5    The pattern here is that he's convincing these people to

6    lend him money.

7             So I just wanted to correct the record.

8             Other than that, we will rest on our prior

9    arguments.

10            MR. HAYES:  Your Honor, asking someone for money

11   is not a crime.  Getting a loan from someone that you care

12   for or love or are in a relationship with, that's not a

13   crime.  That's not what we're here for.

14            THE COURT:  I have her letter so I'm basing my

15   conclusions on what she wrote.

16            MR. HAYES:  Thank you, Your Honor.  I did

17   misspeak.  I did not --

18            THE COURT:  It's attached to the government's

19   memorandum.

20            MR. HAYES:  I did not mean to say that he

21   learned about the investigation, meaning the contact that

22   the agents had with her.  That's really what I meant to

23   say.  I didn't mean to make any misrepresentations.  We're

24   here for fraud.  We're not here for getting loans from

25   someone you're dating.  I ask the Court to give that very

1    little weight.

2            Thank you.

3            THE COURT:  Thank you.

4                (Pause.)

5            THE COURT:  Before imposing sentence I do want

6    to explain the factors that a district court must take

7    into consideration in determining the sentence to be

8    imposed in a particular case.  Under Title 18 United

9    States Code Section 3553, the factors applicable in this

10   case that are to be considered by a Court in imposing

11   sentence are as follows:

12           One, the nature and circumstances of the offense

13   and the history and characteristics of the defendant;

14           Two, the need for the sentence imposed to serve

15   the various purposes of a criminal sentence, which I will

16   discuss in a moment;

17           Three, the kinds of sentences available;

18           Four, the kinds of sentence and the sentencing

19   range established for the defendant's category of offense

20   committed by someone with the defendant's criminal history

21   category under the Sentencing Guidelines;

22           Five, any pertinent policy statement issued by

23   the Sentencing Commission;

24           And six, the need to avoid unwarranted sentence

25   disparities among defendants with similar records who have

1    been found guilty of similar conduct.

2          And seven, the need to provide restitution to

3    any victims of the offense.

4          Mr. Riley, I have taken into account and thought

5    about each of these factors and I will explain to you how

6    I've reached a decision as to what I believe is the

7    appropriate sentence in your case.

8          First of all, I have reviewed the Presentence

9    Report prepared by the Probation Office.  I have

10   considered the remarks made here today by your counsel and

11   by you, the remarks by Ms. Correa, and the remarks by

12   counsel for the government.  I also received sentencing

13   memoranda from both the government and from the defense,

14   and the defense memorandum includes your letter, letters

15   of support on your behalf and a letter from Dr. Heibel.

16         I'm also taking into account the need for the

17   sentence in this case to serve the various purposes of a

18   criminal sentence, and pursuant to Section 3553, the

19   sentence should be sufficient but not greater than

20   necessary to serve these purposes.

21         First, I must consider the need for the sentence

22   imposed to provide just punishment for the offense.  Part

23   of the meaning of a just punishment is that it not be

24   unduly different from sentences received by defendants

25   with similar records who have been convicted of similar

conduct.

Second, I must consider whether there is a need for the sentence imposed to protect the public from further crimes committed by you.

Third, I must consider the need for the sentence imposed to afford adequate deterrence to criminal conduct.

Fourth, I must consider the need for the sentence imposed to reflect the seriousness of the offense and to promote respect for the law.

And finally, I must also consider the need for the sentence imposed to serve the goal of rehabilitation by considering whether there is a need to provide you with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In your case I'm particularly aware of the need to impose a sentence that constitutes just punishment for your offense conduct and the need to deter you from committing further offenses.  And I'm going to explain why in the context of discussing the request for a downward departure or variance.

The defense has moved for a downward departure pursuant to Guideline Section 5H1.3 based on the defendant's mental and emotional condition.  I have studied the letter from Dr. Heibel and I will say this: Regardless of whether Dr. Heibel is knowledgeable about

1    all of the defendant's prior actions and conduct, he did

2    not provide an analysis that took that into account.  And

3    I did note the reference in his report or letter to the

4    defendant being a, quote, caretaker child, and the

5    doctor's reference to smiling depression.  Looking at the

6    entire course of conduct here that Mr. Riley engaged in --

7    and that's summarized in the Presentence Report under

8    relevant conduct, Paragraphs 26 through 36 -- and the

9    other information I have before me, I really do not see

10   any causal effect.

11           There's also a request that I take into account

12   the fact that Mr. Riley has never been in prison before.

13   And I think that's based on United States versus Mishoe.

14           I believe the government makes this point in its

15   memorandum, and I agree, that Mr. Riley is not a typical

16   first-time offender.  When you look at his long history of

17   defrauding people, he is not a first -- a typical

18   first-time offender.  And I don't think that's an

19   appropriate consideration.

20           There's also a passing reference to an argument

21   that the fraud guidelines result in sentencing

22   recommendations that are irrationally harsh.  That's one

23   of the cases that's cited, I believe.  I think it bears

24   noting that if all we had was the loss that is involved

25   here, Mr. Riley's advisory range under the Guidelines

1    would be 12 to 18 months, because his total offense level

2    would be 13.  But in fact, his offense level is higher

3    because of his conduct in defrauding the bankruptcy court,

4    which is a very serious matter indeed.  I can't emphasize

5    how serious that is.  And also, a combination of factors

6    that together I think are really related to the elaborate

7    nature of the scheme in which he engaged.

8           Finally, with respect to the argument with

9    respect to the impact on Mr. Riley's family, ex-spouse

10   I'll include, and children, it is not unusual.  As a

11   matter of fact, it's an ordinary incidence of being

12   imprisoned that the family suffers too.  What is atypical

13   here is that we have a defendant who had been able to

14   provide a lot of good things for his family.  A lot of our

15   defendants come in and they haven't had a comfortable

16   life-style.  So when you have white collar cases where

17   people were living a comfortable life-style they lose

18   more, or their families lose more when they go to prison.

19   That's not an argument for saying they shouldn't go to

20   prison.

21          In any event -- and I don't minimize the

22   hardship on the ex-wives and the children -- but in any

23   event, it's outweighed by the aggravating circumstances

24   here.  And the aggravating circumstances are:

25          Number 1, what was done to the bankruptcy court

1   and in the bankruptcy court.

2          Number 2, the fact that we have other victims.

3   We have, in addition to the bankruptcy court, the

4   financial institutions.  And those costs get passed on to

5   consumers.

6          Number 3 as an aggravating factor we have that

7   the defendant was living a life-style that was comfortable

8   and that is unlike many defendants who come in here and

9   have obtained much less by way of money to support their

10   lives and their families as a result of their offense

11   conduct.

12          We also have what I think is a fair description

13   of the scheme as an elaborate scheme.

14          And then finally -- and this probably is, in my

15   mind, the most significant factor, aggravating factor --

16   we have a long course of conduct that's summarized under

17   relevant conduct and in some of the letters that I've

18   received that shows that Mr. Riley has a history that -- I

19   think the government used the term "financial predator."

20   It's the history of a financial predator.  And that's why

21   I conclude that specific deterrence is a need in this

22   case.

23          So for those reasons I will not depart and I

24   will impose a Guidelines sentence.

25          Would you please stand, Mr. Riley.

1        Mr. Riley, I hereby sentence you to the custody

2    of the Bureau of Prisons for a period of 24 months.

3        After imprisonment you shall be placed on

4    supervised release for a period of three years.  A

5    condition of your supervised release will be that you not

6    commit another federal, state or local crime during the

7    term of supervision.

8        As a further condition of your supervised

9    release you shall not possess a controlled substance.

10        A further condition is that you shall cooperate

11    in the collection of a sample of your DNA.

12        I am waiving the mandatory condition that you

13    refrain from any unlawful use of a controlled substance

14    and submit to periodic drug testing because there is a low

15    risk of substance abuse by you in the future.

16        Special conditions of your supervised release

17    shall be as follows:

18        One, you must comply with the terms of any court

19    order or order of an administrative process requiring you

20    to pay child support or alimony.

21        Two, you must pay the restitution that is being

22    ordered in this case in accordance with the terms of

23    restitution order.  The monthly payment schedule may be

24    adjusted, based on your ability to pay, as determined by

25    the probation officer and approved by the Court.

1          Three, until you have paid all monetary

2     penalties imposed by the Court, you must not incur new

3     credit card charges above $500 or open additional lines of

4     credit without the approval the probation officer.  You

5     must not add any new names to any lines of credit and you

6     must not be added as a secondary cardholder on another's

7     line of credit.

8          Four, until you have paid all monetary penalties

9     imposed by the Court, you must not encumber, transfer,

10    sell, give away, barter or dissipate in any way any

11    assets, including personal property, without the written

12    approval of the United States Probation Office.

13         Five, upon request by the United States

14    Probation Office you must submit a proposed budget

15    detailing expected income and expenses to the probation

16    officer, after which the probation officer will

17    communicate his or her written approval to you.  You must

18    adhere to the approved budget and any deviations must be

19    approved in writing before incurring and paying the

20    expense.  Any receipt of income or an asset not

21    anticipated by the approved budget must be reported by you

22    to the probation officer within two days of the receipt of

23    the income or asset, or within two days of your receipt of

24    knowledge that such income or asset will be received,

25    whichever comes sooner.  Such unanticipated income or

1    asset cannot be disposed of without prior written

2    permission of the probation officer.  Any expense or

3    expenses or liability or liabilities, individually or

4    collectively, which, when calculated over any 30-day

5    running period total or totals in excess of $250 and which

6    are not included in the approved budget must be reported

7    by you to the probation officer within two days of the

8    first day you incurred or learned of the expense or

9    expenses or liability or liabilities, whichever comes

10   sooner.

11          Six, you must retain receipts for inspection,

12   upon reasonable notice, for any expenditure greater than

13   $250.

14          Seven, you must provide the probation officer

15   access to any requested financial information and

16   authorize the release of any financial information.  The

17   Probation Office may share financial information with the

18   United States Attorney's office.

19          And eight, you must not use personal identifying

20   information, including the name, date of birth, or Social

21   Security number, of another person, including your minor

22   children, to open any accounts in the name of that person,

23   obtain any goods or services in the name of that person or

24   otherwise cause any liabilities or legal obligations to be

25   imposed on that person without the written permission of

1    the person.  For your minor children you must obtain

2    written permission from the children's mother, except for

3    medical emergencies when the children are in your care.

4         Of course all of the standard conditions of

5    supervised release in this district shall also apply in

6    your case and those conditions will be set forth in the

7    judgment in this case.

8         If you violate your conditions of supervised

9    release the Court would be free to sentence you to

10   additional time in prison of up to two years.  The

11   consequences of a failure to comply with the conditions of

12   supervised release are extremely serious and the Court

13   would not hesitate to sentence you to additional time in

14   prison if you violated the terms of your supervised

15   release.

16        Do you understand that, sir?

17        THE DEFENDANT:  Yes.

18        THE COURT:  Thank you.

19        The Court hereby directs the Probation Office to

20   provide the defendant with a written statement that sets

21   forth all of the conditions of the defendant's supervised

22   release.

23        Mr. Riley, I'm not ordering you to pay a fine

24   because your financial condition is such where you will

25   not have the ability to pay a fine in addition to the

1    restitution that's being ordered.

2          You shall be required to pay restitution in the

3    total amount of $211,142 to the following victims of your

4    offense pursuant to Title 18 United States Code 3663A.

5    And 3664 as is set forth in the plea agreement.

6              Avant, Inc., $20,318.

7              FirstMark Citizen's, $49,722.

8              Lending Club Corporation, account ending in

9    6015, $26,525.

10             Lending Club Corporation, account ending in

11   4668, $19,051.

12             PayPal Credit, account ending 8576, $5,781.

13             SoFi Lending Corp, account ending in 6070,

14   $42,139.

15             SoFi Lending Corp, account ending in 8119,

16   $48,205.

17          You must pay the restitution that is imposed by

18   this judgment in a lump sum immediately.  If you are

19   unable to pay the full balance in a lump sum, any

20   remaining balance is payable at a rate of not less than

21   $250 per month, or 10 percent of your gross monthly

22   income, whichever is greater.  The monthly payment

23   schedule may be adjusted, based on your ability to pay, as

24   determined by the probation officer and approved by the

25   Court.

1          In addition, I note that nothing in this order

2    shall prevent the Bureau of Prisons from implementing the

3    restitution payments in accordance with its inmate

4    financial obligations programs.  Each payment will be for

5    the benefit of the victims on a basis that is pro rata

6    with the amount of their respective losses.  As required

7    by Title 18 United States Code Section 3664, I have

8    arrived at this schedule after considering your financial

9    resources and other assets, including whether any of those

10   assets are jointly controlled, your projected earnings and

11   other income, and any of your other financial obligations,

12   including obligations to dependents.

13         In that the purpose of restitution is

14   essentially compensatory, that is, to restore a victim to

15   the extent money can do so to the position the victim

16   occupied before sustaining injury, I am making the

17   restitution order contingent upon your ability to pay and

18   I am requiring full and complete financial disclosure by

19   you to the Probation Office on a quarterly basis during

20   your period of supervised release.

21         Finally, I note for both your benefit and the

22   benefit of the victims of your offense that a victim, the

23   government or the offender may petition the Court at any

24   time to modify a restitution order as appropriate in view

25   of a change in the economic circumstances of the offender.

1            Finally, you shall pay a mandatory special

2    assessment of $100, which is due and payable immediately.

3            Please be seated, sir.

4            The judgment will be prepared for my signature

5    by the Clerk's Office.

6            Mr. Riley, I want to make sure that you

7    understand that you have the right to appeal within 14

8    days any sentence that the Court imposes.  Also, the Court

9    will allow you to appeal and to use the services of an

10   attorney at no cost to you if can you not afford to pay

11   yourself.

12           Do you understand that, sir?

13           THE DEFENDANT:  Yes.

14           THE COURT:  Thank you.

15           Mr. Hayes, is there an application for

16   self-surrender?

17           MR. HAYES:  There is, Your Honor.  I would ask

18   for 45 to 60 days if that's possible.

19           THE COURT:  Does the government have any

20   position, Mr. Patel?

21           MR. PATEL:  No objection, Your Honor.

22           THE COURT:  Mr. Riley has been in compliance, so

23   the application for release pending execution of sentence

24   is being granted.  The defendant shall self-surrender

25   directly to the facility designated by the Bureau of

1    Prisons on March 25, 2020 no later than 12:00 noon under

2    his own power and at his own expense.  In the event the

3    defendant does not receive a designation by the Bureau of

4    Prisons prior to the surrender date, he must

5    self-surrender as instructed by the United States

6    Marshal's Service on March 25, 2020 no later than 12:00

7    noon.

8              Mr. Hayes, have you explained to your client the

9    sanctions to which he would be exposed if he fails to

10   surrender himself as ordered by the Court?

11             MR. HAYES:  I have, Your Honor.

12             THE COURT:  Okay.  Do counsel have anything they

13   can think of that we should particularly make note of in

14   the judgment or statement of reasons?

15             MR. HAYES:  If I may, Your Honor, I would ask

16   for a recommendation to Otisville.

17             THE COURT:  I forgot to ask about that.  Thank

18   you for mentioning that, Mr. Hayes.

19             MR. HAYES:  Beyond that, I don't believe so,

20   Your Honor.

21             THE COURT:  I will -- let me write it in so we

22   don't lose track of that.

23             MR. HAYES:  Thank you.

24             THE COURT:  Is there anything else before we

25   recess?

1          MR. PATEL:  Not from the government, Your Honor.

2          MR. HAYES:  No, sir.

3          THE COURT:  Thank you both.

4          MR. HAYES:  Thank you, Your Honor.

5          THE COURT:  We'll recess.

6               (Whereupon, a recess followed.)

7                    12:22 PM

54

1                          C E R T I F I C A T E

2

3                      UNITED STATES V. JOEL RILEY

4                           3:19CR105(AWT)

5

6

7          I, Corinna F. Thompson, RPR, Official Court

8   Reporter for the United States District Court for the

9   District of Connecticut, do hereby certify that the

10  foregoing pages, pages 1 – 53, are a true and accurate

11  transcription of AN EXCERPT OF my shorthand notes taken in

12  the aforementioned matter on January 23, 2020, to the best

13  of my skill and ability.

14

15

16

17

18                  /s/_____

19                    CORINNA F. THOMPSON, RPR
                       Official Court Reporter
20                    450 Main Street, Room #225
                      Hartford, Connecticut 06103
21                        (860) 712-8345

22

23

24

25